UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

HUMBERTO BAEZ,

       *Petitioner*,

-against-

UNITED STATES OF AMERICA,

       *Respondent*.

18-CR-168 (ARR)

NOT FOR ELECTRONIC
OR PRINT PUBLICATION

**OPINION & ORDER**

ROSS, United States District Judge:

    Petitioner, Humberto Baez, was convicted on charges related to a conspiracy to import and distribute cocaine and sentenced to 156 months' imprisonment. *See* Judgment 1–3, ECF No. 162. During his criminal proceedings, Mr. Baez was represented by two attorneys, David Gordon and Lawrence M. Herrmann. *See* ECF Nos. 5 & 62. He now moves to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255, on the grounds that his attorneys provided ineffective assistance. *See* Def.'s Mot. Vacate Judgment of Conviction ("Pet."), ECF No. 170. For the reasons below, his motion is denied.

## BACKGROUND

### *Arrest and Pretrial Developments*

    Mr. Baez was arrested on March 8, 2018 and subsequently indicted on charges related to a conspiracy to import cocaine through the Dominican Republic to the United States for distribution. Presentence Investigation Report ¶¶ 9, 15, 19 ("PSR"); Superseding Indictment 1–2, ECF No. 31. Immediately following Mr. Baez's arrest, Judge Marilyn D. Go appointed Mr. Gordon as Mr. Baez's attorney. *See* ECF No. 5. On September 7, 2018, Mr. Baez, accompanied by Mr. Gordon, met with the government and claimed that he had been working with law enforcement in the

Dominican Republic to undermine the charged conspiracy. Pet. 1168.[1] Specifically, Mr. Baez claimed that, "during the pendency of the charged narcotics conspiracy" he had "provided information about the charged cocaine shipment" to a law enforcement agent in the Dominican Republic named Lieutenant Felix Molina. *Id*.[2] During this meeting, Mr. Baez also provided the government with letters from two other officials in the Dominican Republic, Captain Arcangel Lorenzo and Lieutenant Coronel Antonio Quezada Castillo ("Lieutenant Quezada"), in which the officials "vouch[ed] for the defendant as a collaborator with the government of the Dominican Republic." *Id*.

On September 13, 2018, the government informed Mr. Gordon that agents from the Drug and Enforcement Administration ("DEA") had interviewed Lieutenant Quezada, who apparently stated that he wrote the letter for Mr. Baez "at the request of Coronel Rafael Dias Almonte" and that he "had no information as to whether the contents of the letter were accurate." *Id*. at 1169. The government disclosed that it had also interviewed Coronel Almonte, who stated that he had asked Lieutenant Quezada to write the letter "as a favor" to Mr. Baez upon the request of Mr. Baez's wife, and that he believed the letter would be used to "help [Mr. Baez] secure a new job." *Id*. According to the government, Coronel Almonte claimed "that he had no information supporting the assertion in the letter that the defendant had provided information to the armed forces of the Dominican Republic since 1990." *Id*. The government also disclosed that it had been unable to interview Captain Lorenzo regarding his letter. *Id*. Shortly following these disclosures, on

---

[1] Citations to Mr. Baez's Petition refer to ECF page numbers.

[2] Mr. Baez initially referred to his contact as "Lieutenant Montilla," but later clarified that his name was in fact "Lieutenant Molina." *See* Pet. 1168 n.1.

2

September 14, 2018, Mr. Baez pleaded guilty to Count One of the superseding indictment, conspiracy to import cocaine. *See* ECF No. 64; Superseding Indictment ¶ 1.

Days after his guilty plea, Mr. Baez retained Mr. Herrmann as his new counsel. *See* ECF No. 62. On September 18, 2018, immediately following Mr. Herrmann's appearance in the case, the government provided Mr. Herrmann with the disclosures described above regarding DEA's interviews with Lieutenant Quezada and Coronel Almonte and its inability to interview Captain Lorenzo. Pet. 1168–69. The government also disclosed that on September 13, 2018, DEA agents interviewed Lieutenant Molina, the officer with whom Mr. Baez claimed to have shared details about the charged conspiracy. *Id.* at 1169. According to the government, Lieutenant Molina stated that Mr. Baez had told him about "a Mexican man with suspicious cargo" in February 2018, and that he had not heard from Mr. Baez since that time. *Id*. Shortly after the government provided Mr. Herrmann with these disclosures, Mr. Baez moved to withdraw his guilty plea. *See* ECF No. 71. Judge Jack B. Weinstein granted the motion on September 20, 2018. *Id*.

Mr. Herrmann next requested a series of continuances, seeking additional time to familiarize himself with the facts of the case and review discovery before trial. *See* ECF Nos. 73 & 78. Mr. Herrmann also indicated that he anticipated traveling to the Dominican Republic to interview potentially exculpatory witnesses. ECF No. 73 at 1–2; ECF No. 78 at 1. Judge Weinstein granted Mr. Herrmann's requested adjournments, and trial was eventually set for February 2019. *See* ECF Nos. 75, 79, 96. On November 27, 2018, Mr. Herrmann advised the court that he would not be taking any witness depositions pursuant to Federal Rule of Civil Procedure 15. *See* ECF No. 85. On December 18, 2018, Mr. Herrmann informed the court that Mr. Baez would be the sole defense witness. *See* ECF No. 92. According to Mr. Baez, Mr. Herrmann "admitted to never visiting the Dominican Republic" or "reaching out" to potential exculpatory witnesses. Pet. 7.

## *Trial Proceedings*

### *The Government's Case*

At trial, the government argued that Mr. Baez was responsible for a "four-step scheme to import cocaine" that involved: (1) sourcing the cocaine from abroad and finding investors to fund the scheme; (2) identifying a produce import company to traffic the drugs; (3) organizing drug-free produce shipments, or "dry runs," to establish a business relationship between the export and import companies; and (4) importing a shipment of cocaine hidden within produce boxes. Trial Tr. 24:13-17, 25:4-14, ECF No. 170. The government's case relied in large part on the testimony of two cooperating witnesses, Garibaldy Jerez and Ismael Ornelas.

Garibaldy Jerez was Mr. Baez's indicted co-conspirator who began cooperating with the government following his arrest. *See id.* at 383:17, 384:24–386:1; Superseding Indictment. Mr. Jerez testified that he had recruited Mr. Baez—who owned a fruit import company—to participate in the conspiracy on behalf of "Dominican investors" who were seeking an import company that could be used to traffic cocaine into the United States. *See* Trial Tr. 267:1–269:6. Mr. Jerez described how he worked with Mr. Baez and the Dominican investors to arrange two dry run shipments, as well as a third shipment with cocaine. *Id.* at 442:11–454:19. He also described how Mr. Baez served as an intermediary for money transfers that were designed to give the appearance of a "legitimate deal" between the import and export companies. *Id.* at 403:25–407:25.

The other critical cooperating witness was Mr. Ornelas, the owner of a wholesale business who had met Mr. Baez through a mutual acquaintance sometime around 2008 to 2009. *Id.* at 59:12-20, 80:13-20. Mr. Ornelas began cooperating with the government in 2013 after pleading guilty to charges related to a conspiracy to import marijuana into the United States. *Id.* at 60:16–61:10. He testified that in August 2016, Mr. Baez approached him about using Mr. Ornelas's wholesale

4

company to import cocaine. *Id*. at 85:7–86:5, 87:5-12. Mr. Ornelas further testified that he informed his contact at the DEA about the conversation and subsequently began working with Mr. Baez under DEA supervision, gathering information on the drug trafficking operation. *See id*. at 89:2–96:20. Mr. Ornelas characterized Mr. Baez as the organizer of the operation, *id*. at 62:17-22; he explained that Mr. Baez had arranged for him to meet with associates in the Dominican Republic and Ecuador to negotiate sourcing the cocaine, *id*. at 92:17–101:8; and he described how Mr. Baez arranged for him to sublease a warehouse near Philadelphia where the drugs would be stored for distribution once they arrived, *see, e.g.*, *id*. at 102:14–104:17, 123:19–127:21, 166:17-167:4.

Under DEA supervision, Mr. Ornelas recorded many of his conversations with Mr. Baez, and these recordings, as well as text messages between the two men, were introduced as evidence at trial. *See, e.g.*, *id*. at 75:16–79:10, 97:19–99:20, 114:13–117:11, 146:6–147:15, 216:15–218:20. Mr. Ornelas testified to the meaning of these conversations, including a conversation in May 2017 in which he, Mr. Baez, and an associate in the Dominican Republic discussed the price of the source cocaine, at what port the cocaine would arrive, and the need to do dry runs of drug-free produce shipments that would establish a business relationship between the exporter and Mr. Ornelas's company to avoid suspicion. *Id*. at 104:18–113:14. The government also introduced a recording of a call from February 2018 in which Mr. Baez informed Mr. Ornelas of "ripe tomatoes" in a shipment; Mr. Ornelas testified that he understood this to mean that the shipment contained cocaine and that he immediately informed his DEA supervisors. *Id*. at 211:20–215:11.

One of those DEA supervisors, Mark Hadzewycz, testified that his team, along with agents from Customs and Border Protection, seized the shipment in Florida and found roughly 16 kilograms of cocaine hidden in produce boxes. *Id*. at 328:6–333:5, 346:5-8; *see also id*. at 247:11–

249:1 (stipulated testimony of DEA chemist on the quantity of seized cocaine). A few days later, Agent Hadzewycz and other DEA agents arrested Mr. Baez in Manhattan. *Id*. at 351:3–353:16. Agent Hadzewycz further testified that in Mr. Baez's post-arrest interview on March 8, 2018, Mr. Baez did not make any statements regarding his role as an informant or collaborator for the government of the Dominican Republic, his efforts to alert that government to the cocaine shipment, or any other efforts to sabotage the shipment. *Id*. at 676:8–680:6.

The government's other evidence included, among other things, photographs of Mr. Baez at the Philadelphia warehouse, *id*. at 126:3-5, 320:19–321:8; Mr. Baez's bank records and images of payment receipts, *id*. at 317:12–318:2, 527:11–532:25; cell tower data corroborating witness accounts of Mr. Baez's presence at various meetings, *e.g.*, *id*. at 376:1–377:5, 382:1–5; photographs of the seized shipping container as well as the bill of lading for the shipment, *id*. at 44:9–45:11, 330:15-20; and one of the seized boxes of produce and multiple packets of the seized cocaine, *id*. at 340:19–341:3, 347:11–349:3. The government also provided expert testimony from DEA special agent Claudia Caballero, who testified that 16 kilograms of cocaine (the amount of cocaine in the seized shipment) was likely worth over $500,000 in the New York region and that possession of this quantity of cocaine was consistent with a purpose of distribution rather than personal use. *Id*. at 247:3-10, 249:7-10, 257:16–258:22.

<u>The Defense's Case</u>

The defense's case turned on Mr. Baez's lack of criminal intent. In his opening statement, Mr. Herrmann told the jury that Mr. Baez had participated in the drug trafficking operation as "an unpaid informal cooperator with Dominican law enforcement" and that his goal all along had been to "have the[] drugs stopped and seized in the Dominican Republic." *Id*. at 31:21-22, 32:16-17. Mr. Herrmann emphasized that Mr. Ornelas and Mr. Baez had a history of unsuccessful business

partnerships. *Id*. at 29:22–30:14. He suggested that it was Mr. Ornelas who had approached Mr. Baez with the idea of importing cocaine, and that Mr. Baez agreed to participate in the scheme as an opportunity to inform on Mr. Ornelas and "repay" him "for all his attempts to scam Mr. Baez" in the past. *Id*. at 30:25–31:11. Mr. Herrmann also explained to the jury that because the defense did not contest Mr. Baez's participation in the scheme—only the intent behind his participation—he would not challenge much of the government's evidence. *Id*. at 29:15-19.

Consistent with his opening remarks, Mr. Herrmann stipulated to many of the government's trial exhibits and did not challenge the testimony of many of the government's witnesses on cross examination. *See, e.g.*, 77:22–79:10, 247:11–249:1, 259:1-11, 290:2–293:6, 382:11, 527:20–529:6. In cross-examining Mr. Ornelas, Mr. Herrmann focused on his history with Mr. Baez, asking him questions regarding their failed effort to create an energy drink brand together in the early 2000s, *id*. at 227:12–231:24, as well as other business ventures that Mr. Ornelas had proposed to Mr. Baez over the years, *id*. at 232:25–238:1. Mr. Herrmann also pressed Mr. Ornelas on whether it was Mr. Ornelas, and not Mr. Baez, who had initially proposed the cocaine import scheme. *See id*. at 238:2-25.

Mr. Herrmann called only one witness, Mr. Baez. Mr. Baez testified that he had been a "collaborator" with Dominican law enforcement since the 1990s, *id*. at 580:1-25; that Mr. Ornelas came to him with the idea of importing drugs, *id*. at 595:12-14; that he agreed to participate in the scheme so that he could inform on Mr. Ornelas to Dominican law enforcement, *id*. at 595:22–596:9; that he contacted Lieutenant Molina multiple times in advance of the cocaine shipment and provided him with Mr. Ornelas's name and information about the scheme, *id*. at 598:20–599:20, 602:14–604:13, 625:24–626:15; and that he attempted to sabotage the cocaine shipment by creating various "red flags" for government inspectors, *id*. at 614:6–615:3, 617:10–620:2.

7

On February 14, 2019, the jury found Mr. Baez guilty on all three counts: conspiracy to import five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 952(a), 963, 960(a), and 960(b)(1)(B)(ii); conspiracy to distribute and possess with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 846, 841(a), and 841(b)(1)(A)(ii)(II); and distribution and possession with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. § 841(a) and 841(b)(1)(A)(ii)(II). Verdict 1–3, ECF No. 122; *see also* Judgment 1–2. Mr. Herrmann immediately moved for a judgment of acquittal, which Judge Weinstein denied. Trial Tr. 822:22-24.

## *Sentencing*

On May 22, 2019, Mr. Herrmann submitted a sentencing memorandum to Judge Weinstein reiterating his argument that Mr. Baez participated in the conspiracy as an informant and renewing his motion for a judgment of acquittal. *See* Def.'s Sentencing Mem. 1–3, ECF No. 127. Mr. Herrmann cited evidence from trial to support Mr. Baez's defense and included an affidavit from General Juan Alberto Caceres Ureña, a Dominican law enforcement officer, that stated that Mr. Baez became a law enforcement "collaborator" in the 1990s. *Id*. at 1–3, 6. Mr. Herrmann also advocated for a "[n]on-[g]uideline sentence," noting that Mr. Baez was a "first felony offender," *id*. at 3, and he provided the court with letters from Mr. Baez's family, friends, and business associates written in support of Mr. Baez's character, *see* ECF No. 128.

The government requested a guidelines sentence of 235 to 293 months' imprisonment. *See* Gov't Sentencing Mem. 6, ECF No. 142. This range reflected a proposed two-point enhancement for obstruction of justice based on Mr. Baez's repeated claims that he had been acting as an informant. *Id*. at 6–7; *see also* PSR ¶ 23. In response, Mr. Herrmann sought a Fatico hearing to determine whether the obstruction of justice enhancement applied. *See* Gov't Opp'n, Ex. B at 29–

8

30, ECF No. 172-2.[3] To support the hearing request, Mr. Herrmann again submitted the letter from General Ureña stating Mr. Baez had been a collaborator of Dominican law enforcement. *See id*. at 30–40.

On February 12, 2020, I was assigned to Mr. Baez's case following Judge Weinstein's recusal. *See* ECF No. 153. On August 12, 2021, I sentenced Mr. Baez to a statutory sentence of 156 months' incarceration on all three charges, to run concurrently, followed by five years of supervised release. Sentencing Tr. at 21:20-22, ECF No. 167. Because I imposed a statutory sentence that was unaffected by the obstruction enhancement, I determined that a Fatico hearing on the enhancement was not necessary. *Id*. at 11:3-11.

## Post-Sentencing Procedural History

Following sentencing, Mr. Baez retained new counsel and appealed his conviction and sentence to the Second Circuit. *See* Notice of Appeal, ECF No. 165. Mr. Baez argued on appeal that he received ineffective assistance from Mr. Gordon and Mr. Herrmann. *United States v. Baez*, 21-2020 (2d Cir.), Br. for Def.-Appellant at 6–7, ECF No. 24. The Second Circuit dismissed the appeal but permitted Mr. Baez to raise his ineffective assistance of counsel claims as part of any "subsequent section-2255 motion" that he chose to file in district court. *United States v. Baez*, No. 21-2020, 2022 WL 10219667, at *2 (2d Cir. Oct. 18, 2022). The Second Circuit noted in particular that Mr. Baez's allegations of ineffective assistance "would benefit from further development of the record," and that it would be important to provide Mr. Gordon and Mr. Herrmann an opportunity to respond to his allegations. *Id*.

On January 17, 2024, Mr. Baez filed the instant motion in this court. *See* Pet 1–2. The government filed a brief in opposition, and Mr. Gordon submitted an affidavit addressing Mr.

---

[3] Citations to this exhibit refer to ECF page numbers.

Baez's arguments as they related to his representation. *See* Gov't Opp'n, ECF No. 172; Gordon Aff., ECF 173. In its opposition brief, the government stated that after attempting to provide notice of the petition to Mr. Herrmann, the government learned that he had passed away on December 13, 2023. Gov't Opp'n 10.

## LEGAL STANDARD

Under 28 U.S.C. § 2255(a), a federal prisoner may petition his sentencing court to "vacate, set aside or correct" his sentence "upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States." Because the constitutional right to counsel encompasses "the right to the effective assistance of counsel," a petitioner may seek to vacate his sentence on the grounds that his counsel was ineffective. *Strickland v. Washington*, 466 U.S. 668, 685–86 (1984). To establish constitutionally ineffective assistance of counsel, a petitioner must show both (1) that his attorney's representation was deficient, falling "below an objective standard of reasonableness," and (2) that this deficient performance prejudiced the petitioner. *Id*. at 688, 692. The "prejudice" prong of the *Strickland* test requires the petitioner to demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of a proceeding. *Strickland*, 466 U.S. at 694. Courts applying the *Strickland* test should consider attorney errors "in the aggregate," bearing in mind that the accumulation of errors may "alter[] the entire evidentiary picture" presented to the judge or jury. *Lindstadt v. Keane*, 239 F.3d 191, 199 (2d Cir. 2001) (quoting *Strickland*, 466 U.S. at 697–98).

## DISCUSSION

In his petition, Mr. Baez argues that he received ineffective assistance of counsel when: (1)

10

his trial counsel failed to "scrutinize, interview, or formally record statements from exculpatory witnesses who would validate Mr. Baez's defense"; (2) both pre-trial and trial counsel failed to challenge the prosecution's preliminary motions or file any on Mr. Baez's behalf; (3) his trial counsel's "hearing impairment detrimentally impacted his performance at trial"; (4) his trial counsel "validated the credibility of the government's expert witness" on cross-examination; (5) his trial counsel made "only . . . three objections during the five days of trial testimony"; and (6) his trial counsel provided "negligible" sentencing advocacy, including by failing to contest the government's sentencing memorandum accusing the defendant of perjury and attempts to mislead the court. Pet. 27.

The Supreme Court has instructed that, where possible, a court should "dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice," without "grad[ing] counsel's performance" by evaluating whether the representation was reasonable. *Strickland*, 466 U.S. at 697. Accordingly, for the reasons explained below, I conclude that Mr. Baez fails to establish the *Strickland* prejudice prong, and I deny the motion without deciding the reasonableness prong. *See Garner v. Lee*, 908 F.3d 845, 861 (2d Cir. 2018).[4]

I.  **Pre-Trial and Trial Representation**

   A.  **Trial Counsel's Failure to Investigate or Call Potential Witnesses**

Mr. Baez argues that Mr. Herrmann's "most glaring misstep" was his failure to investigate or "formally record" the testimony of potentially exculpatory witnesses, namely "Dominican law enforcement witnesses ready to testify under oath that Mr. Baez had served as an informant for Dominican authorities." Pet. 28. Mr. Baez suggests that this error was prejudicial because, without the corroboration of these witnesses, he was "unable to credibly testify to his involvement as a

---

[4] The timeliness of Mr. Baez's petition is not disputed. *See* Pet. 4; *see generally* Gov't Opp'n.

11

collaborator with the Dominican anti-drug agency, or their secret service," or to his efforts to report the conspiracy to Dominican law enforcement. *Id*. at 22.

I conclude that Mr. Baez has not established that Mr. Herrmann's failure to investigate or call these potential witnesses was prejudicial. First, the evidence before me does not suggest that testimony from these witnesses would have significantly assisted Mr. Baez's defense. Mr. Baez identifies five potential witnesses in his petition: Captain Lorenzo, Lieutenant Quezada, Coronel Almonte, Lieutenant Molina, and General Ureña. *See id*. 5–24. Notably, he does not submit new evidence regarding the testimony these witnesses could have provided if deposed or called, so I must instead rely on evidence in the trial, sentencing, and appeal record. Below, I review this evidence with respect to each of the potential witnesses Mr. Baez identifies.

Captain Lorenzo. According to the government's September 18, 2018 *Brady* disclosure letter, on September 7, 2018, Mr. Baez provided the government with a letter from Captain Lorenzo "vouching for the defendant as a collaborator with the government of the Dominican Republic." *Id*. at 1168. The government also disclosed that DEA agents had attempted to interview Captain Lorenzo regarding the letter but had been unable to do so. *Id*. at 1169. A DEA investigation report states that agents were eventually able to interview Captain Lorenzo on September 21, 2018. Gov't Opp'n, Ex. B at 20. According to the report, Captain Lorenzo told DEA agents that Mr. Baez had "provided intel" to him between roughly 1998 and 2005, but that he had not received intel from Mr. Baez for approximately five to seven years. *Id*. Captain Lorenzo acknowledged speaking to Mr. Baez in February 2018, but he reiterated that "no criminal intel was passed" during that conversation. *Id*. He also stated that Mr. Baez was never given the authority to work "proactively." *Id*. at 21.

Lieutenant Quezada and Coronel Almonte. The government's September 18, 2018

disclosure letter also stated that Mr. Baez provided the government with a letter of support from Lieutenant Quezada. Pet. 1168. The government disclosed that DEA agents had interviewed Lieutenant Quezada on September 11, 2018, and that he stated that he had written the letter at the request of Coronel Almonte and "had no information as to whether the contents of the letter were accurate." *Id*. at 1169. DEA agents then interviewed Coronel Almonte, who apparently stated that he had asked for the letter because Mr. Baez's wife requested it "to help [Mr. Baez] secure a new job," but that he "had no information supporting the assertion in the letter that [Mr. Baez] had provided information to the armed forces of the Dominican Republic since 1990." *Id*.

<u>Lieutenant Molina</u>. At trial, Mr. Baez testified that he had contacted Lieutenant Molina multiple times between 2016 and 2018 to provide him with information on the conspiracy. He claimed that: in 2016, he provided Lieutenant Molina with Mr. Ornelas's name and told him that Mr. Ornelas was likely "planning to bring in drugs from the Dominican Republic to New York," Trial Tr. 598:20–599:7, 653:4–654:2; in 2018, he told Lieutenant Molina the name of the Dominican company involved in the scheme and reiterated that Mr. Ornelas was "the most important person" to monitor, *id*. at 602:14–603:8; and, in later 2018, he provided Lieutenant Molina with identifying information about the third shipment from the Dominican Republic and told him that the shipment would likely include cocaine, *id*. at 603:14–604:13, 625:24–626:15.

According to the government's disclosure letter, when DEA agents interviewed Lieutenant Molina following Mr. Baez's arrest, he stated that Mr. Baez had contacted him in February 2018 and told him that "there was a Mexican man with suspicious cargo." *Id*. at 1169. A DEA investigation report states that, in a subsequent interview, Lieutenant Molina told agents that this February 2018 conversation was the first time Mr. Baez had ever mentioned the suspicious cargo, and that, prior to the conversation, Mr. Baez had not provided him intel since the 1990s. Gov't

13

Opp'n, Ex. B at 17–18. He also apparently stated that Mr. Baez did not provide him with "any other specifics such as the person's name, a cargo shipment date, or a company's name." *Id*. at 17. Last, the report notes that Lieutenant Molina stated that Mr. Baez "was never asked to work proactively" on any investigation. *Id*. at 18.

General Ureña. General Ureña's affidavit, which Mr. Herrmann submitted at sentencing, states that Mr. Baez became "a collaborator" during the period when General Ureña "commanded the department of Secret Service of the National Police," sometime around 1990. Def.'s Sentencing Mem. at 6. (General Ureña died shortly after he wrote the letter. *See* Sentencing Tr. 3:4, ECF No. 166.)

Nothing in the above suggests that any of the potential witnesses Mr. Baez identifies would have been able to corroborate his claim that he provided Dominican officials with specific information related to the charged conspiracy in an attempt to derail the operation. Four of the potential witnesses—Captain Lorenzo, Lieutenant Quezada, Coronel Almonte, and General Ureña—do not appear to have had any information about Mr. Baez's work as a government collaborator after the 1990s or early 2000s. Lieutenant Molina's interviews suggest that Mr. Baez provided him with a vague tip in 2018 that may have been related to the conspiracy, but his statements to DEA interviewers otherwise directly contradict Mr. Baez's testimony.

Any benefit to calling these individuals to testify to Mr. Baez's history as a government collaborator likely would have been severely limited—or even outweighed—by the fact that apparently none of them could corroborate Mr. Baez's account of his efforts to inform the government of the charged conspiracy. And, again, Mr. Baez does not offer any new evidence to suggest that these individuals would have provided different or additional testimony, distinct from

what is in the record, that would have been more helpful to his defense. *Cf. Lindstadt*, 239 F.3d at 203, 205 (reversing denial of habeas petition where counsel failed to call two witnesses whose testimony outside the presence of the jury established that they "could have provided essential corroboration for [petitioner's] testimony"); *Gersten v. Senkowski*, 426 F.3d 588, 612, 615 (2d Cir. 2005) (affirming grant of habeas petition where petitioner identified potential expert witnesses who, had they been called, could have provided testimony that reasonably could have caused the trier of fact to "reject[] the entirety of the alleged victim's narrative").

Additionally, the government presented substantial evidence against Mr. Baez at trial, including evidence that undermined Mr. Baez's claim that his true goal had been to undermine the conspiracy and flag illegal activity for law enforcement. Mr. Ornelas testified that Mr. Baez instructed him to use various strategies to avoid detection by law enforcement, including: deleting incriminating text messages, Trial Tr. 117:6-11; avoiding phone conversations with co-conspirators, or, when speaking on the phone, using code words to refer to cocaine, *id*. at 120:2-15; and, eliminating financial records of drug sales, or, when necessary, documenting sales as a series of small transactions, *id*. at 179:3-10. On cross-examination, Mr. Baez admitted that he never attempted to contact law enforcement or regulatory agencies in the United States to alert them of the conspiracy, even after it became clear that the cocaine shipment had made it past Dominican regulators. *See id*. at 657:24–658:18. Agent Hadzewycz similarly testified that although Mr. Baez agreed to be interviewed by DEA agents following his arrest, he made no mention in the interview that he was a collaborator for Dominican law enforcement, or that he had attempted to sabotage the conspiracy. *Id.* at 676:8–680:6. This evidence makes it less likely that testimony from the potential witnesses Mr. Baez identifies could have significantly bolstered his credibility at trial. Given the strength of the government's case, as well as the lack of evidence that the potential

15

witnesses could have provided testimony that would have meaningfully aided Mr. Baez's defense, I conclude that Mr. Baez has not established prejudice from Mr. Herrmann's failure to call or otherwise investigate these witnesses.

### B. Additional Arguments

Mr. Baez next argues that he received ineffective assistance when his pre-trial and trial counsel failed to file pretrial motions on his behalf or to challenge the prosecution's preliminary motions, including a motion to exclude defense-favorable elements of Mr. Baez's post-arrest statements to law enforcement. Pet. 27; *see also* Mem Supp. Gov't's Mots. *in Limine*, ECF No. 48; ECF No. 57 (letter from Mr. Gordon indicating that "defendant does not object to the granting" of the government's motions *in limine*). Mr. Baez does not, however, identify any specific pre-trial motions that his counsel should have filed, nor does he identify any objections to the government's motions that counsel should have raised. Accordingly, it is unclear what effect, if any, counsels' inaction had on the outcome of his trial.

Likewise, Mr. Baez has not established prejudice from Mr. Herrmann's relatively few objections at trial. The petition argues that Mr. Herrmann's representation was ineffective because he "lodged a mere three objections" over the course of the trial. Pet. 30. However, it is not clear from the petition what specific objections Mr. Herrmann should have made, or how his failure to make these objections contributed to the guilty verdict. In summarizing the trial proceedings, Mr. Baez notes that Mr. Herrmann did not object to the "admission of exhibits that contained potentially unauthenticated voice recordings," *id*. at 11; however, he does not actually identify any unauthenticated voice recordings that were improperly admitted,[5] much less explain the

---

[5] On this point, Mr. Baez cites to passages in the trial transcript in which Mr. Ornelas discusses various recorded conversations. *See id*. at 11; Trial Tr. 107:11–112:4 (testimony regarding Government Exhibits 300-1 and 302), 128:4–132-11 (testimony regarding Government Exhibits

16

significance of those recordings to the outcome of the trial. Mr. Baez also notes that Mr. Herrmann did not object to Mr. Ornelas's "speculative" testimony regarding the meaning of the recorded conversations between him and Mr. Baez. *See id*. at 11. However, courts in this Circuit have permitted lay witnesses with "insider perceptions of a conspiracy" of which the lay witness was a member to testify to the meaning of "ambiguous terms or phrases" used in audio recordings of conversations related to the conspiracy. *United States v. Ghavami*, 23 F. Supp. 3d 148, 171 (S.D.N.Y. 2014), aff'd sub nom. *United States v. Heinz*, 607 F. App'x 53 (2d Cir. 2015) (quoting *United States v. Yannotti*, 541 F.3d 112, 126 (2d Cir. 2008)). Mr. Baez does not address this case law or explain why Mr. Ornelas's testimony is distinguishable. He therefore fails to demonstrate that Mr. Herrmann allowed the jury to hear improper testimony. Accordingly, Mr. Baez does not establish prejudice based on Mr. Herrmann's limited objections at trial.

The petition next faults Mr. Herrmann for "validat[ing] the credibility" of one of the government's expert witnesses, Agent Claudio Caballero, on cross-examination. Pet. 27. Specifically, Mr. Baez argues that Mr. Herrmann erred by "extolling" Agent Caballero's expertise in front of the jury, and by failing to challenge her on "her lack of personal knowledge of the defendant, or her inability to connect the cocaine tested to the defendant in the case." *Id*. at 13, 30. In context, however, these purported errors were negligible. The government relied on Agent Caballero's testimony to establish the approximate value of 16 kilograms of cocaine. *See* Trial Tr. 257:16–258:22, 705:16-22. It also relied on her testimony for her stated opinion that this amount

---

303-2 and 304-1). Although Mr. Baez does not explain his citations further, the implication seems to be that these recorded conversations were not properly authenticated. However, Mr. Ornelas testified to the authenticity of these recorded conversations when they were received in evidence. *See id*. at 76:3–77:18 (discussing authenticity of Government Exhibits 300 through 329). Mr. Baez does not argue this authentication was defective, and he fails to otherwise establish that any of the recordings he references were unauthenticated.

17

of cocaine was consistent with a purpose of distribution rather than personal use. *Id*. As such, Agent Caballero's "lack of personal knowledge" of Mr. Baez and her "inability to connect the tested cocaine" to Mr. Baez was largely irrelevant to her testimony and to the government's overall case. Moreover, Mr. Baez's defense turned on his lack of intent, and he did not dispute the government's claim that cocaine had been smuggled into the United States for distribution. It is therefore unclear how the jury's perception of Agent Caballero's credibility could have meaningfully affected Mr. Baez's ability to establish his defense.

Mr. Baez also claims that Mr. Herrmann had a hearing impairment that detrimentally impacted his performance at trial. Pet. 27. Mr. Herrmann's hearing impairment is documented in the trial record. Judge Weinstein noted the issue at the start of trial and confirmed with Mr. Baez that he was aware of the impairment and wished for Mr. Herrmann to represent him. Trial Tr. 4:6-16, 5:24–6:3. Judge Weinstein also took steps to ensure that Mr. Herrmann's participation was not affected by the impairment: He allowed Mr. Herrmann and Mr. Baez to withdraw during trial to have private conversations, *id*. at 3:14-20, 5:15-23; he instructed opposing counsel to use a microphone when speaking, *id*. at 16:9-14; and he interrupted the government's summation to allow Mr. Herrmann to reposition himself so that he could better hear, *id*. at 698:20-21. Mr. Herrmann himself asked for clarification or repetition when he was unable to hear. *See, e.g.*, *id*. at 81:18-20, 135:14-15, 211:7-8. Mr. Baez does not identify any instance in which Mr. Herrmann's hearing negatively affected his performance.[6] Thus, while the trial record confirms Mr.

---

[6] Mr. Baez suggests that, at one point during his cross-examination of Mr. Ornelas, Mr. Herrmann may have unnecessarily rephrased a question to the witness because he did not hear Judge Weinstein overrule the government's objection to his initial question. *See* Pet. 12; Trial Tr. 229:1-10. Although it is unclear why Mr. Herrmann rephrased his question to Mr. Ornelas, it is also unclear that his decision to do so negatively affected the cross-examination. In fact, his rephrased question ("Do you believe that a background check would have revealed your federal conviction in 2000?") was more direct than his initial question ("Could you have survived a background check

18

Herrmann's hearing impairment, it does not appear that his impairment significantly limited his participation in the proceedings or otherwise affected the trial outcome.

In sum, Mr. Baez has not established a reasonable probability that, but for the issues he identifies in his petition, the trial verdict would have been different. *See Strickland*, 466 U.S. at 694. Even in the aggregate, these issues are not enough to undermine confidence in the outcome of Mr. Baez's trial. Mr. Baez therefore fails to establish that he was prejudiced by his pre-trial and trial representation.

## II. Sentencing Representation

Finally, Mr. Baez argues that Mr. Herrmann provided "negligible sentencing advocacy." Pet. 27. The petition states that Mr. Herrmann failed "to contest . . . [the government's] sentencing memorandum that accused the defendant of perjury and attempting to mislead the court," and failed to address the sentencing factors at 18 U.S.C. § 3553(a) in either his sentencing memorandum or his remarks at the sentencing hearing. *Id*. at 23–24, 27. These arguments are not persuasive. First, Mr. Herrmann *did* contest the government's memorandum by requesting a Fatico hearing on the government's proposed obstruction of justice enhancement. *See* Gov't Opp'n, Ex. B at 29–30. And regardless, I determined the dispute over the enhancement was ultimately irrelevant because I gave Mr. Baez a statutory sentence that was unaffected by the enhancement. *See* Sentencing Tr. 11:5-11, ECF No. 167. Second, I explicitly considered the § 3553(a) factors at sentencing, including factors that I determined to be mitigating. *See id*. at 18:19–21:19. Mr. Baez does not identify any specific § 3553(a) factor that I overlooked and that Mr. Herrmann should have emphasized further. It is therefore unclear how Herrmann's failure to discuss the § 3553(a) factors affected Mr. Baez's sentence. *See United States v. Williams*, 563 F. App'x 827, 830 (2d

---

with your conviction at that time?") and may have been preferable.

Cir. 2014) (concluding counsel's failure to discuss § 3553(a) factors at sentencing was not prejudicial where sentencing court "expressly considered" factors and where petitioner did not identify which factors "counsel should have highlighted for the court"). Thus, Mr. Baez does not establish that Mr. Herrmann's sentencing advocacy was prejudicial.

## CONCLUSION

For the reasons above, I conclude that Mr. Baez's motion does not satisfy the prejudice prong of the *Strickland* test. "[A] Court may appropriately rule on a section 2255 motion without a testimonial hearing where . . . the allegations of the motion, accepted as true, would not entitle the petitioner to relief." *Rosa v. United States*, 170 F. Supp. 2d 388, 398 (S.D.N.Y. 2001). As explained above, even accepting as true Mr. Baez's factual account of his attorneys' conduct, he has failed to establish prejudice under *Strickland*. I therefore decline to hold an evidentiary hearing on Mr. Baez's motion. The motion is DENIED.

SO ORDERED.

/s/
Allyne R. Ross
United States District Judge

Dated:   April 18, 2024
         Brooklyn, New York